The Full Commission, sitting en banc, has reviewed the Award based upon the record of the proceedings before the Deputy Commissioner and the arguments and briefs before the Full Commission.
Plaintiff made a motion, pursuant to Rule 701(1) of the North Carolina Workers' Compensation Rules, to strike and to prohibit arguments before the Full Commission for issues not specifically appealed by defendant. Defendant did not file notice of appeal or assignments of error. The only issue raised by plaintiff on appeal was the proper calculation of the average weekly wage. The defendant did not appeal from or assign as error the Deputy Commissioner's determination that plaintiff contracted asbestosis, an occupational disease, while in the employ of defendant. However, in defendant's response brief to the Full Commission, the defendant asserted for the first time that the Deputy Commissioner erred in allowing any recovery to plaintiff because the employer had never been declared to be a "dusty trade" pursuant to N.C. Gen. Stat. § 97-60. Defendant further argued that N.C. Gen. Stat. § 97-60 applies to this case and bars any recovery to plaintiff unless his employer had been designated a "dusty trade."
Rule 801 of the North Carolina Workers' Compensation Rules allows the Commission, in its discretion in a particular case, and in the interest of justice, to waive its rules. In this case, due to the important policy and legal issues raised, the Full Commission will determine all issues in dispute. Accordingly, plaintiff's motion to strike is hereby DENIED.
The appealing party has shown good grounds to reconsider the evidence. Upon much detailed reconsideration of the record as a whole, the Full Commission has determined that there are no good grounds to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support the following Findings of Fact, Conclusions of Law, and Award. The July 10, 1998, Opinion and Award of Deputy Commissioner Hoag is hereby MODIFIED AND AFFIRMED.
 ***********
The Full Commission find as facts and conclude as matters of law the following, which were entered into by the parties at the initial hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. The defendant is self-insured.
4. Plaintiff was diagnosed with asbestosis on May 3, 1994.
5. The following documents were stipulated into evidence:
a. Medical records of Dr. Stephen Proctor
b. Medical records of Dr. Douglas G. Kelling, Jr.
c. Medical records of Dr. Michael J. Kelly
d. Medical records of Dr. Terry W. Wallace
e. Medical records of Dr. B. Rama Rao
f. Medical records of Dr. Robert W. Patton, Sr.
g. Medical records of Dr. Harold F. Snider
 h. Plaintiff's response to Defendant's First Set of Interrogatories dated April 27, 1995
 i. Defendant's response to plaintiff's First Set of Interrogatories and Request for Production and Supplemental Responses dated July 18, 1996
 j. The asbestos permit and notification for demolition-renovation; permit N.C. 65875 dated February 10, 1995
 k. The February 9, 1995 letter from Julia F. Parker to the N.C. Department of EHNR
 l. The February 13, 1995, Mecklenburg County Department of Environmental Protection MESHAP Notification of Demolition and Removal
 m. The Industrial Commission file in its entirety.
6. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. Plaintiff's Exhibit 1 — asbestos sampling taken from locations in the Charlotte plant November 13 
14, 1986
 b. Plaintiff's Exhibit 2 — Julia F. Parker's February 9, 1995, letter to MCDEP, air quality section and the eight pages attached thereto
 c. Defendant's Exhibit 1 through 3 — photographs of the three roll calendar area
d. Defendant's Exhibit 4
e. Defendant's Exhibit 6
 f. Various X-rays and CT scans of Wayne F. Austin were identified as exhibits during the depositions of the medical experts and are accepted into evidence.
 ***********
Based upon all of the competent, credible, and convincing evidence of record and reasonable inferences drawn therefrom, the Full Commission make the following additional:
 FINDINGS OF FACT
1. Plaintiff is a 72-year-old married male who is retired. He attended school through the sixth grade. While in the Navy, he completed the ninth grade level.
2. Prior to his employment with defendant, the plaintiff had little, if any, asbestos exposure while working for Cannon Mills, St. Johns Shipyard, the Navy on board the U.S.S. Hornet, American Can, and Western Asbestos (a misnomer, as the company produced acoustical tiles which were not made of asbestos). Plaintiff worked for McDonald Douglas for ten years in Charlotte, where he may have had some exposure to asbestos.
3. Plaintiff had a brief smoking history but stopped smoking when he was 26 years old.
4. Plaintiff worked for the defendant from August 7, 1967, until his retirement on June 1, 1987.
5. Plaintiff commenced working for defendant in 1967 as a carpenter/painter and spent 15 years in that job classification. As a carpenter/painter, plaintiff worked in every area of defendant's facility except the computer room. Defendant's plant, which was built in the late 1960's, contained a large amount of asbestos insulation on the steam pipes throughout the facility. Approximately three miles of asbestos pipe insulation was removed in one removal project at the facility in 1990.
6. As a painter, plaintiff was required to paint the curing presses and other machines. In preparation for painting, plaintiff cleaned the machines with a solvent and used compressed air to blow off the machines and adjoining pipes, which were covered with asbestos-containing insulation. Blowing compressed air onto the asbestos-insulated steam lines caused clouds of dust to be raised and caused the release of asbestos fibers. While painting machines, the plaintiff crawled and walked on asbestos-insulated steam pipes to get to the various portions of the machine. Walking on the pipes caused the asbestos insulation to crumble. The asbestos insulation on the steam lines in the curing presses area was generally in a poor state of repair, caused by the extensive work done in the area, the large number of people walking on the steam pipes, and spilling of hot rubber onto the asbestos insulation, which rubber would have to be scraped off later.
7. One of the plaintiff's duties as a painter/carpenter was cutting asbestos-containing platen gaskets that were on the curing presses. Plaintiff cut these with either a saber saw or a hand saw, which caused the release of asbestos fibers. No ventilation or duct collection system was utilized. The dust and fibers were collected and blown onto the floor to be swept up later. During the early years of the plant, many gaskets did not fit properly and had to be cut. The centers of the gaskets were trimmed one to two inches, and a cutout was made for the platen pipe. During the early years, the plaintiff had to cut asbestos platen gaskets every day or so.
8. While working as a painter, plaintiff painted the ceiling in two bays of the warehouse. Asbestos-insulated steam pipes ran to the heater in the ceiling. The asbestos insulation on the pipes was damaged because pallets of tires were stacked to the ceiling in the warehouse area and came into contact with the insulation.
9. Plaintiff painted in the banbury area, which contained significant amounts of asbestos insulation on the pipes. Plaintiff came into contact with the asbestos as he crawled over the pipes to paint.
10. Plaintiff painted the third floor area. The oil tanks there had over 1,000 square feet of 3% amosite and 25% chrysotile asbestos that was friable and in poor condition. The pipe insulation on the third floor area contained approximately 600 linear feet of amosite and chrysotile asbestos which was friable and in poor condition. Plaintiff was exposed in these areas to the release of asbestos fibers.
11. Plaintiff also painted outside pipes and tanks. These pipes were 40% chrysotile and were damaged and friable. The insulation on the tanks was 5-10% chrysotile asbestos insulation and was damaged and non-friable.
12. Plaintiff spent approximately six months as a trimmer at the defendant's facility. There was no evidence that the plaintiff was exposed to asbestos while he worked as a trimmer.
13. Plaintiff spent approximately five years as a let-off man on the three-roll calendar machine. There were at least 300 linear feet of asbestos pipe insulation in the three-roll calendar area. The pipes in this area developed leaks, and the pipe fitters repaired the leaks. The asbestos insulation would not be repaired for many weeks and in the meantime would lie open. Each day plaintiff cleaned his machine. He blew off the machine and the asbestos insulation with compressed air, which created dust and caused the release of asbestos fibers. Workers on the three-roll calendar machine frequently came into physical contact with the asbestos insulation. Each week, plaintiff cleaned the rollers. The only way to get to the rollers was to crawl over and through the asbestos-covered steam pipes.
14. During his twenty year employment with defendant, plaintiff was never given respiratory protection, except while painting.
15. For the twenty years that plaintiff worked for defendant, he was never warned about the presence of asbestos or given any training about how to work around asbestos.
16. While plaintiff was working for defendant, asbestos fibers were constantly present in the ambient air, exposing plaintiff and his co-workers to asbestos on a daily basis.
17. During the 1990 asbestos removal at defendant's plant, the removal company found asbestos lying on the floor at the south end of Row Number 9 in the curing press area, asbestos insulation in the grating on the floor that had accumulated over many years, asbestos containing material lying on overhead piping and support beams, and asbestos pipe insulation lying in pieces on the floor.
18. At the initial hearing, plaintiff, Bill Evans, Charles Adams, Johnny Jones, and Richard Calder testified for plaintiff. The witnesses corroborated plaintiff's testimony and elaborated on the amount of asbestos in defendant's plant during the time of plaintiff's employment. Plaintiff's testimony regarding his extensive exposure to asbestos fibers is thus corroborated and found to be credible and convincing. Defendant's major witness referred to an air study which was conducted after the removal of much of the asbestos in the plant and after plaintiff retired and is thus found to be irrelevant and neither credible nor convincing.
19. While working for defendant, plaintiff was exposed to the hazards of asbestos for more than thirty working days over seven consecutive months during the period from August 7, 1967 through June 1, 1987.
20. Plaintiff was last injuriously exposed to the hazards of asbestos while employed by defendant.
21. Plaintiff was not diagnosed with asbestosis until after his retirement from defendant. He had no breathing problems, pulmonary problems or abnormalities with his lungs until after his retirement. His problems subsequent to retirement were minor, mainly consisting of shortness of breath upon exertion.
22. While plaintiff was still employed by defendant in 1987, an Examobile came by the union hall where plaintiff was present. He was given X-ray and spirometric tests. At that time, he had no symptoms of asbestosis but was told he might have asbestosis. The specific findings from the Examobile tests were "bilateral pleural changes, consistent with asbestos exposure." Plaintiff visited his regular doctor, Dr. Martin, who disagreed with the Examobile diagnosis.
23. Plaintiff received no additional information about his potential disease until a physical examination was conducted by Dr. Robert Patton, his primary care physician in Rock Hill Family Practice in South Carolina. Dr. Patton subsequently reconsidered his diagnosis of asbestosis.
24. Plaintiff did not receive a definitive diagnosis of asbestosis until Dr. Michael J. Kelly of Charlotte Radiology examined him on May 3, 1994.
25. Dr. Kelly, interpreting a CT Scan of plaintiff's chest, found extensive bilateral pleural plaquing and calcification consistent with asbestos exposure and minimal pulmonary fibrosis primarily involving the lung bases.
26. On July 29, 1994, plaintiff had a complete respiratory evaluation performed by Dr. Douglas G. Kelling, Jr., a member of the North Carolina Advisory Medical Panel Board. Dr. Kelling diagnosed plaintiff with asbestosis and asbestos-related pleural disease.
27. On January 11, 1996, plaintiff had a pulmonary function test performed by Dr. Stephen Proctor, a pulmonologist in Rowan County, North Carolina. The pulmonary function test indicated plaintiff had a mild restrictive ventilatory defect consistent with asbestosis. Dr. Proctor also determined that under the American Medical Association classification scheme for respiratory impairment, plaintiff would be Class II (10-25%) moderate impairment.
28. On November 27, 1996, a new chest X-ray and CT Scan were performed by Dr. Fred M. Dula, who is a NIOSH certified B-reader and one of three North Carolina Industrial Commission Certified Dusty Trade Film Readers.
29. Dr. Dula found extensive pleural, diaphragmatic and pericardial calcification along with interstitial changes consistent with asbestosis on the CT Scan. On the chest X-ray, Dr. Dula found extensive plaque formation along with interstitial changes, consistent with asbestosis. In completing the ILO standard form for pneumoconiosis, Dr. Dula noted that plaintiff had a profusion rating of 1/2.
30. According to Dr. Dula, plaintiff had short, thickened interlobular lines extending to the pleural surface, the lowest stage findings in asbestosis. Dr. Dula also found plaintiff had small parenchymal bands.
31. Dr. Sawyer also reviewed plaintiff's CT Scan and X-ray. Dr. Sawyer did not find parenchymal abnormalities.
32. There is substantial diversity of opinion as to whether plaintiff has asbestosis. The doctors deposed had diametrically opposite opinions. However, all doctors agree that plaintiff has extensive pleural plaques which result from asbestos exposure, but are not necessarily indicative of asbestosis.
33. Plaintiff does not have an impairment of lung function or loss of use of his lungs as a result of the formation of bilateral pleural plaques. Plaintiff's pleural plaques have not impaired his respiratory function. Plaques can be benign markers and are so in plaintiff's case.
Pleural plaque formation is a marker indicating long-term exposure to asbestos. Pleural plaques are due to scarring and resulting collagen deposits that develop on the pleural covering on the outside of the lung from asbestos exposure. If present long enough, as in plaintiff's case, they become calcified and are clearly visible on X-rays and CT Scans. Pleural plaques are an abnormality of the body and an inflammatory reaction to an external source, such as asbestos exposure.
34. Asbestosis oftentimes involves parenchymal abnormalities affecting the lung itself and occurs when asbestos fibers migrate into the lung tissue, eliciting inflammatory responses and causing diffuse scarring or fibrosis in the lung. This scarring or fibrosis is often evidenced by interstitial fibrosis identifiable on chest X-rays and sometimes manifested by restrictive impairment of pulmonary function as well as abnormal diffusion capacities.
35. After consideration of all the medical evidence of record and a careful weighing of the testimony on both sides of the issue of whether plaintiff has asbestosis, greater weight is accorded to the opinions of Dr. Kelly, Dr. Kelling and Dr. Dula than to the opinions of Dr. Sawyer and Dr. Barnett. Dr. Kelling is on the Advisory Medical Panel for the North Carolina Industrial Commission. Dr. Michael Kelly is a radiologist who reviewed plaintiff's films due to random assignment on that day. Plaintiff suffers from asbestosis, evidenced most clearly by irregular linear opacities and blurring of the parenchymal points at the base of both lungs on X-rays and CT scans and manifested by mild to moderate pulmonary impairment. In addition, the testimony of plaintiff's witnesses is credible concerning the amount of asbestos in defendant's plant during the time plaintiff worked there and the amount of fiber dust in the ambient air.
36. Plaintiff's exposure to asbestos in his employment placed him at an increased risk for contracting asbestosis and asbestos-related pleural disease over the general public not so exposed.
37. Plaintiff has asbestosis, which is a characteristic fibrotic condition of the lungs caused by the inhalation of asbestos fibers. Plaintiff has extensive pleural thickening and pleural calcification consistent with asbestos-related pleural disease as well as some minor degree of parenchymal fibrosis, primarily at the base of his lungs. Plaintiff also has pleural disease and mild pulmonary fibrosis.
38. Defendant was not a designated "dusty trade" pursuant to any prior order of the Commission under N.C. Gen. Stat. §97-60. The Act was not intended to bar workers' compensation benefits where the worker's employer has not been designated a "dusty trade". No statutory provision prohibits an award of compensation to a plaintiff whose employment has not been designated a "dusty trade". The employment in this case clearly exposed the employees to substantial amounts of asbestos, but this exposure was not reported to the Commission in order for the Commission to declare the employment a "dusty trade".
39. In the 52 weeks prior to his retirement on June 1, 1987, plaintiff earned a salary of $31,655.99, which yields an average weekly wage of $608.76 and a weekly compensation rate of $405.83. The maximum weekly benefit in effect for 1987 limits the weekly compensation to $308.00. Plaintiff has not returned to work in any capacity for defendant or any other employer.
40. The first four preferred methodologies used to calculate the average weekly wage under N.C. Gen. Stat. § 97-2(5) would not be fair to the parties. Disability and thus earnings under N.C. Gen. Stat. § 97-60 et seq., like those under N.C. Gen. Stat. § 97-31, are conclusively presumed lost, whether actually earned or not. The best evidence of those earnings conclusively presumed lost for retirees suffering from asbestosis and silicosis is the earnings in the last year of employment. The fifth methodology under N.C. Gen. Stat. §97-2(5) is for these exceptional reasons invoked for purposes of calculating average weekly wages for retirees first diagnosed post employment as having asbestosis and silicosis. This method is also fair to the employer because premiums were paid based on that year's payroll. Retirement before a diagnosis of asbestosis should not deprive the employee of the 104 weeks set by the General Assembly as fair compensation for contracting the occupational disease asbestosis.
41. Plaintiff's compensation rate for the purpose of an award under N.C. Gen. Stat. § 97-61.5 is $308.00.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted the occupational disease of asbestosis while in the employ of defendant. N.C. Gen. Stat. §§ 97-53(24) and 97-62.
2. Plaintiff was exposed to the hazards of asbestos for more than 30 days within a seven consecutive month period while employed by the defendant. Plaintiff was in the employment of the defendant when he was last injuriously exposed to the hazards of asbestos. Plaintiff's exposure to the hazards of asbestos while employed by the defendant proximately augmented his asbestosis. N.C. Gen. Stat. § 97-57; Haynes v. FeldsparProducing Co., 222 N.C. 163, 22 S.E.2d 275 (1942);Barber v. Babcock Wilcox Construction Co.,101 N.C. App. 564, 400 S.E.2d 735 (1991).
3. The North Carolina Workers' Compensation Act does not require an employee to work in a formally designated "dusty trade" before he or she is entitled to receive compensation under the Act. N.C. Gen. Stat. § 97-60 et seq.See Stroud v. Caswell Center, 124 N.C. App. 653,478 S.E.2d 234 (1996).
4. Asbestosis and silicosis cases are given exceptional treatment because of the progressive, insidious and incurable nature of those diseases and the long latency period associated with asbestosis and silicosis. Honeycutt v. AsbestosCo., 235 N.C. 471, 70 S.E.2d 426 (1952); Roberts v.Southeastern Magnesia and Asbestos Co., 61 N.C. App. 706,301 S.E.2d 742 (1983).
5. Because of the conclusive presumption of disability, plaintiff is entitled to 104 weeks of compensation regardless of whether he has actually been disabled. The Act provides for the award of 104 weeks of compensation to a plaintiff who has been diagnosed with asbestosis but who has not been disabled. N.C. Gen. Stat. § 97-61.5; Roberts v. Southeastern Magnesiaand Asbestos Co., 61 N.C. App. 706, 301 S.E.2d 742 (1983).
6. Considering all the factors at issue in this case, an appropriate basis for determining a fair and just average weekly wage for plaintiff is to calculate benefits based on the wages last earned by plaintiff in the employment of last injurious exposure. N.C. Gen. Stat. §§ 97-2(5) and 97-61.5.
7. Having contracted asbestosis, plaintiff is entitled to payment of weekly compensation at the rate of $308.00 per week for 104 weeks. N.C. Gen. Stat. §§ 97-61.5(b) and 97-2(5).
8. Plaintiff is entitled to payment of all reasonable medical expenses that have been or may be incurred as a result of his development of the occupational disease asbestosis. N.C. Gen. Stat. § 97-59.
9. This case was not unreasonably defended in view of the conflicting medical testimony on the issue of diagnosis. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay 104 weeks of compensation to the plaintiff at the rate of $308.00 per week. All compensation having accrued, defendant shall pay it to plaintiff in a lump sum subject to attorney's fees. Defendant shall pay interest on the award at 8 per cent per annum from the date of the hearing before the Deputy Commissioner, pursuant to N.C. Gen. Stat. § 97-86.2.
2. A reasonable attorney's fee of 25 percent of the lump sum compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from the sums due plaintiff and paid directly to his counsel. The interest shall be paid to plaintiff and no interest shall be paid to plaintiff's attorney.
3. Defendant shall pay medical expenses related to plaintiff's occupational disease incurred and to be incurred in the future when bills for the same have been approved in accordance with the provisions of the Act. Further, plaintiff shall undergo additional examinations at defendant's expense as provided by law pursuant to provisions of N.C. Gen. Stat. § 97-61.1 etseq.
4. Plaintiff's request for attorney's fees to be awarded pursuant to N.C. Gen. Stat. § 97-88.1 is hereby DENIED.
5. Defendant shall pay the costs.
 S/ _____________________ J. HOWARD BUNN, JR. CHAIRMAN
 S/ _____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/ _____________________ THOMAS J. BOLCH COMMISSIONER
 S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER
 S/ _____________________ CHRISTOPHER SCOTT COMMISSIONER
 S/ _____________________ DIANNE C. SELLERS COMMISSIONER